IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BARBARA RAMSEY, | ) | CASE NO. 1:12 CV 1738 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | WILLIAM H. BAUGHMAN, JR. |
| | ) | |
| PENN MUTUAL LIFE INSURANCE | ) | |
| COMPANY, | ) | **MEMORANDUM OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

## Introduction

This is a diversity case[1] arising out of defendant Penn Mutual Life Insurance Company's refusal to pay death benefits to plaintiff Barbara Ramsey on the death of her husband John Ramsey, the insured. Before me[2] are cross-motions for summary judgment.[3] In addition to briefing their respective motions,[4] responding in opposition,[5] and replying to

---

[1] ECF # 1, Ex. B. The matter was removed here after being initially filed in an Ohio court.

[2] The parties have consented to my exercise of jurisdiction. ECF # 7.

[3] ECF # 67 (Penn Mutual's motion), ECF # 69 (Ramsey's motion).

[4] ECF # 68 (Penn Mutual's brief in support), ECF # 70 (Ramsey's brief in support).

[5] ECF # 74 (Ramsey's opposition), ECF # 75 (Penn Mutual's opposition).

such responses,[6] the parties have participated in an oral argument on these motions[7] and submitted joint stipulations of fact before[8] and after[9] the oral argument.

For the reasons that follow, Ramsey's motion will be denied and Penn Mutual's motion will be granted.

## Facts

### A.    Background facts

Although the parties have raised and argued many facts, the relevant facts underlying the present action are contained in the supplemental joint stipulation of fact.[10]

In February 2010, John Ramsey completed and signed an application for a life insurance policy with Penn Mutual.[11] Part of that application was a "medical examiner's report" that was prepared by an LPN working for Penn Mutual based on answers given by Ramsey, with the completed application signed by Ramsey.[12] In that section Ramsey stated

---

[6] ECF # 79 (Penn Mutual's reply), ECF # 80 (Ramsey's reply).

[7] ECF # 81 (minutes of hearing), ECF # 91 (hearing transcript).

[8] ECF # 66.

[9] ECF # 94.

[10] *Id.*

[11] *Id*. at ¶12.

[12] *Id*. at ¶ 13.

-2-

that he had been hospitalized for  colitis in 1984 but that he had made a "full recovery" and had last been seen for this condition in 2006, which examination yielded "normal findings."[13]

Also included in the application was a so-called "good health" representation whereby Ramsey agreed that insurance would not be issued unless the first premium was paid in full, the policy was delivered, and his "health, habits, occupation and other facts" are "the same as described" in the application, the medical examiner's report attached, and in any subsequent amendments or supplements.[14]

Based on the disclosure of colitis, Penn Mutual determined that additional information was needed before a policy could issue.[15] In that regard, Penn Mutual, with Ramsey's approval, obtained various medical records and, after reviewing those records, offered to insure Ramsey at a higher than usual premium.[16]

Virtually contemporaneous with this event, Ramsey was examined by Ian Lavery, M.D., the physician who had treated him for colitis in 1984,[17] because Ramsey was experiencing "diarrhea/blood in stool" and "having frequent bloody bms and feels bad."[18] A follow-up examination by Dr. Lavery a month later, in May 2010, revealed that medication

---

[13] *Id.*, Ex. E.

[14] *Id.*, Ex, D.

[15] *Id.*, at ¶¶ 15, 16.

[16] *Id.*, at ¶ 21; Ex. I.

[17] *Id.*, at ¶ 2.

[18] *Id.*, Ex. J at 2.

had produced "some improvement" in Ramsey's symptoms but that he was "still having 15+ loose stools a day."[19]

Subsequent to these visits to Dr. Lavery, which were then unknown to Penn Mutual, Penn Mutual drafted amendments to Ramsey's application for coverage.[20] The amendments asked if Ramsey had "ever been treated for, or had any indication of: ... intestinal bleeding, ulcer, hernia, colitis, ... or other disorder of the stomach, intestines, liver or gall bladder?"[21] In both cases, Ramsey, on June 1, 2010, answered, "Yes, I had a colon resection in 1984 due to colitis. My last colonoscopy was in 2004. I have not had a colonoscopy since 2004 and have had no gastrointestinal problems since that time."[22] Ramsey, however, did not disclose in this amendment that he had seen Dr. Lavery in April and May of 2010, despite, as noted above, having represented in the original application that he had not seen Dr. Lavery since 2006.

---

[19] *Id.*, Ex. K.

[20] *Id.*, at ¶¶ 30, 31.

[21] *Id.*, at Exs. L, M.

[22] *Id.*

Contemporaneously with or shortly after Ramsey's execution of the application amendments, Penn Mutual thereupon completed delivery of  separate policies for term life insurance and whole life insurance to Ramsey.[23]

Shortly thereafter, on June 24, 2010, during surgery to address five months of "rectal bleeding and diarrhea,"[24] John Ramsey was discovered to have colon cancer,[25] and died fifteen months later due to complications from that cancer.[26] There is no dispute that Ramsey had continued to make all premium payments on the two life insurance policies from Penn Mutual from their issuance to the date of his death.[27]

Ramsey's wife, Barbara, filed an application for death benefits with Penn Mutual, which was denied.[28] In denying coverage, Penn Mutual in particular noted that Ramsey "knew of his treatments between the time of the application and the delivery of the policies,

---

[23] *Id.*, at ¶ 35. The policies were apparently delivered simultaneously with Ramsey's execution of the application amendments on June 1, 2010. *Id.*, Ex. R at 2 (February 27, 2012 letter from Penn Mutual to Barbara Ramsey stating, *inter alia*, that "On June 1, 2010 Mr. Ramsey signed the policy delivery receipt which included an application amendment."). However, while the dates of issue for the policies are stipulated to be March 8, 2010 and April 22, 2010, *id.*, at ¶ 35, the parties do not stipulate as to the date the policies were delivered, but only to the fact that the application amendment was drafted "prior to the delivery of the policies." *Id.*, at ¶ 34.

[24] *Id.*, Ex. O at 2.

[25] *Id.* at ¶ 39.

[26] *Id.* at ¶ 45.

[27] *Id.* at ¶ 46.

[28] *Id.*, Ex. R.

and knew that they rendered untrue the statement in the application that he 'had no gastrointestinal problems since (2004).'"[29] Barbara Ramsey, in turn, filed the present action.[30]

**B.     Parties' arguments**

In its motion for summary judgment Penn Mutual argues first that a condition precedent to formation of a valid contract of insurance was that Ramsey's health be the same at the time the insurance policy was delivered as it was at the time of the application.[31] Because the evidence from Dr. Lavery's visits prior to delivery of the policy show that Ramsey was having serious gastrointestinal problems, including frequent, bloody stools, prior to delivery of the policy, Penn Mutual maintains that Ramsey's health at the time the policy was delivered was not the same as when he made application for the policy, and so, as a matter of law, a necessary condition precedent to formation of an enforceable contract was not met.[32]

Alternatively, Penn Mutual asserts that any right to recover under these policies was precluded by statute when Ramsey willfully gave a false answer to the question in the application and the application amendment concerning whether he had indications of intestinal bleeding.[33] Penn Mutual further argues that Ramsey's signature on the relevant

---

[29] *Id.*

[30] ECF # 1.

[31] ECF # 68 at 9.

[32] *Id.* at 10-11.

[33] *Id.* at 12.

documents ratified and adopted that representation, regardless of who initially drafted the language.[34] Thus, Penn Mutual contends, because Ramsey's answers in both the application and the application amendment were willfully false, made without any knowledge by the insurer of their falsity, and induced the insurer to deliver insurance policies that but for the false answers would not have been delivered, Ramsey violated Ohio Revised Code § 3911.06, which renders the policies void *ab initio*.[35]

Ramsey, for her part, argues that John Ramsey's answers on both the application and the application amendment were not false nor willfully intended to defraud, and further that Penn Mutual had knowledge of the actual situation and so cannot claim ignorance.[36] As concerns the question of willful falsity, Ramsey maintains that John Ramsey was simply experiencing "characteristic symptoms of colitis" in his abdominal pain and bloody stools – symptoms that were known to Penn Mutual and were not unusual or remarkable to Ramsey, except in their severity.[37] In addition, Ramsey urges that any inherent ambiguity in the questions, such as whether the term "gastrointestinal problems" is synonymous with symptoms of chronic colitis, must be resolved by construing the language against Penn Mutual, who, through its agent, drafted the answer.[38]

---

[34] *Id.* at 13.

[35] *Id.* at 14-15.

[36] ECF # 70 at 1.

[37] *Id.* at 8-10.

[38] *Id.* at 14-16.

In essence, Ramsey asserts that John Ramsey had, and was known by Penn Mutual to have, chronic active colitis at the time he applied for the policies, at the time the policies were approved, and at the time the policies were delivered.[39] Thus, she contends, there was no change in John Ramsey's health to his knowledge when he submitted these answers, and there was no willful falsity in his answers.[40]

## Analysis

### A.    Standard of review – summary judgment

The court should grant summary judgment if satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[41]  The moving party bears the burden of showing the absence of any such "genuine issue":

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.[42]

---

[39] *Id*. at 18.

[40] *Id*. at 18-20.

[41] Fed. R. Civ. P. 56(c).

[42] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing Fed. R. Civ. P. 56(c)).

A fact is "material" only if its resolution will affect the outcome of the lawsuit.[43] Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards.[44] The court will view the summary judgment motion "in the light most favorable to the party opposing the motion."[45]

The court should grant summary judgment if a party who bears the burden of proof at trial establishes each essential element of his case.[46] Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."[47]

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmover.[48] The nonmoving party may not simply rely on its pleadings but must "produce evidence that results in a conflict of material fact to be solved by a jury."[49] Moreover, if the nonmovant presents evidence "merely colorable" or not "significantly probative," the court

---

[43] *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

[44] *Id.* at 252.

[45] *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

[46] *McDonald v. Petree*, 409 F.3d 724, 727 (6th Cir. 2005) (citing *Celotex*, 477 U.S. at 322).

[47] *Leadbetter v. Gilley*, 385 F.3d 683, 689 (6th Cir. 2004) (quoting *Anderson*, 477 U.S. at 248-49).

[48] *Id.* at 256.

[49] *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

may decide the legal issue and grant summary judgment.[50] "In other words, the movant can challenge the opposing party to 'put up or shut up' on a critical issue."[51]

In sum, proper summary judgment analysis entails the threshold inquiry of determining whether there is the need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.[52]

## B.     Application of standard – Penn Mutual's motion will be granted

Preliminary to my analysis of the issues presented here, I note again that this is a diversity case, where Barbara Ramsey is a resident of Ohio, and Penn Mutual is a Pennsylvania corporation, and the amount in controversy exceeds $75,000.[53] Accordingly, under the well-known rule of *Erie Railroad Company v. Tompkins*,[54] in adjudicating the motions for summary judgment, I must apply the substantive law of Ohio, the forum state, while utilizing federal procedural law applicable to motions for summary judgment.[55]

---

[50] *Anderson*, 477 U.S. at 249-50 (citation omitted).

[51] *BDT Prods. v. Lexmark Int'l*, 124 F. App'x 329, 331 (6th Cir. 2005).

[52] *Anderson*, 477 U.S. at 250.

[53] ECF # 1 at 2 (brief in support of removal)(citing 28 U.S.C. § 1332).

[54] *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Gasperini v. Ctr. for Humanities, Inc.*, 58 U.S. 415, 427 (1996); *Hoven v. Walgreen Co.*, 751 F.3d 778, 783 (6th Cir. 2014) (citing *Erie*, *Gasperini*).

[55] *Id.*

That said, after consideration of the briefs and the transcript of the oral argument, I find that the question of whether Ramsey violated the policy's so-called "good health" requirement, as understood in Ohio law,[56] is dispositive here, and will compel judgment for Penn Mutual.

The provision at issue is in Part I of the initial application, which Ramsey signed on February 10, 2010, is contained in a section headed "Representations" and reads in pertinent part as follows:

> 1.      Subject to the provisions of the temporary insurance agreement attached to this application, no insurance will be in force until the first premium is paid in full and the policy is delivered while the health, habits, occupation and other facts relating to the Proposed Insured(s) and to the Payor, if a Payor Benefit is issued, are the same as described

---

[56] The parties have not indicated that the insurance contracts here contain a choice of law provision, and I have not found such a provision in my own review of the contracts. In a situation, as here, where the parties have not chosen which law to apply to any dispute concerning their contract, Ohio law has adopted Section 188 of the Restatement, which requires the court to consider the place of making the contract; the place of negotiating the contract; the place of performance; and the domicile, residence, nationality, place of incorporation, and place of business of the parties to determine which state has the most significant relationship to the transaction and the parties; and then to apply the law of that state. *Ohayon v. Safeco Ins. Co. of Illinois*, 91 Ohio St. 3d 474, 477-78, 747 N.E.2d 206, 209-10 (2001) (citing *Gries Sports Enters., Inc. v. Modell*, 15 Ohio St. 3d 284, 473 N.E.2d 807 (syllabus) (1984)).

     In this case, the contract was both negotiated and made in Ohio. The insured lived in Ohio as does his beneficiary. Further, as a contract of insurance made and delivered in Ohio, the contract here was subject to review by the Ohio superintendent of insurance before it was permitted to be delivered, with that review going to questions of whether its terms were unjust, unfair or against state law. Ohio Rev. Code § 3911.011(B). Manifestly, on these points, the conclusion is inescapable that Ohio and its laws demonstrate "the most significant relationship to the transaction and the parties." *See*, *Ohayon*, 91 Ohio St. 3d at 477-78, 747 N.E.2d at 209-10 (quoting Restatement at 575, Section 188(1)).

     Accordingly, Ohio law will be applied here.

-11-

in Part I of the application, any Part II required by the Company and any amendments or supplements to them.[57]

This provision is contained within an overall section which further states that the statements and answers of the application "will be part of the contract of insurance, if issued."[58]

I note first that the section of the application under which the provision appears is "Representations."[59] Although Penn Mutual argues that violation of this section is a failure of a condition precedent to the formation of a valid contract,[60] Judge Helmick of this District in a very recent case addressing precisely this clause in an Ohio life insurance contract[61] was careful to point out that this provision involves "representations, not warranties or conditions precedent."[62] As Judge Helmick observed, the exact language chosen by the insurance company in that case, as here, was that this provision was a "representation," and having selected that plain language, a court "cannot now twist the language [the company] chose

---

[57] ECF # 94, Ex. D at 11.

[58] *Id.*

[59] *Id.*

[60] ECF # 68 at 9.

[61] *John Hancock Life Ins. Co. v. The William R. Ufer, Sr., Irrevocable Trust*, No. 3:11-CV-2344, 2013 WL 2297094 (N.D. Ohio May 24, 2013). Unfortunately, neither this case, nor any of the other relevant cases identified in this section of the opinion as the specific legal principle at issue here, or its applicability, was cited to the Court by either party.

[62] *Id.*, at *4.

-12-

into something different."[63] Moreover, unlike a condition precedent which contemplates the taking of some future action or the occurrence of some future event, the provision here "contemplates only the continued validity of the representations [the proposed insured] made."[64]

To that end *Ufer Trust* quotes *Ohio National Life Insurance Corp. v. Satterfield*,[65] an Ohio appeals court opinion in 2011, which construed virtually the same clause at issue here, which provided that no insurance would come into force until: (1) the policy was delivered, (2) the first premium was paid in full, and (3) that the statements and answers in the application would remain true and complete as of the date the policy was delivered.[66] *Satterfield* noted that because the first two clauses of this provision do identify some event that needed to happen (policy delivery) or act that needed to be performed (payment of first premium) before a valid contract could exist, these clauses are properly characterized as conditions precedent.[67] But, because the final clause does not refer to a future act or event,

---

[63] *Id.*

[64] *Id.*

[65] *Ohio Nat'l Life Ins. Corp. v. Satterfield,* 194 Ohio App.3d 405, 956 N.E.2d 866 (Ohio Ct. App. 2011).

[66] *Satterfield*, 194 Ohio App.3d at 411, 956 N.E.2d at 871.

[67] *Id.* (citing *Mumaw v. Western & Southern Life Ins. Co.*, 97 Ohio St.1, 12, 119 N.E. 132, 135 (1917)).

-13-

but rather is an assurance that the present facts, which the parties all suppose to then be true, remain true, that provision is not a condition precedent.[68]

In addition, I also note that this provision does not involve application of Ohio Revised Code § 3911.06, which by its terms applies to false answers to the interrogatories in the application. As *Ufer Trust* concluded, "Ohio courts have held [§ 3911.06] does not apply when '[t]he stipulation upon which the [insurer] relies is in the policy.'"[69] The reasoning behind this conclusion is well-articulated by the Ohio appeals court in the 2001 decision in *Langley v. Federal Kemper Life Assurance Company.*[70] *Langley* states that when an insurance policy contains a stipulation, such as the provision here which requires that the "health and habits" of the proposed insured remain as stated in the application prior to the insurance taking effect, breach of that stipulation is available as a defense to payment on the policy, "'notwithstanding [§ 3911.06] whose effect is limited to defenses founded on fraud

---

[68] *Id.*

[69] *Ufer Trust*, 2013 WL 2297094, at *3 (citing *Lumpkin v. Metro. Life Ins. Co.*, 75 Ohio App. 310, 62 N.E.2d 189, 191 (Ohio App. 1945) (citing *Metro. Life Ins. Co. v. Howle*, 62 Ohio St. 204, 56 N.E. 908 (1900)).

[70] *Langley v. Federal Kemper Life Assurance Co.*, No. 1AP-129, 2001 WL 1143019 (Ohio Ct. App. 2001).

or misstatements in the application.'"[71] Thus, "R.C. 3911.06 does not apply when assessing the decedent's compliance with the policy terms."[72]

Applying this law to the present case,[73] both the 2001 Ohio appellate court decision in *Langley* and an unpublished 1998 Sixth Circuit decision by Judge Nelson in *Abella v.*

---

[71] *Id.*, at *3 (quoting *Aetna Life Ins. Co. of Hartford, Conn. v. Dorney*, 68 Ohio St. 151, 67 N.E. 254, syllabus ¶ 2 (1903)).

[72] *Id.* While the foregoing fully establishes that Ohio Rev. Code § 3911.06 does not apply when the insurer's defense is based on a failure to comply with a stipulation or representation contained in the policy contract, I also note briefly that Penn Mutual's reliance on *Stipcich v. Metropolitan Life Ins. Co.*, 277 U.S. 311 (1928) (ECF # 68 at 15-17), and Ramsey's unsupported argument that *Stipcich* was somehow superceded by § 3911.06 (ECF # 74 at 16-17), are both inapposite. As the Sixth Circuit stated in *Wuliger v. Mfrs. Life Ins. Co. (USA)*, 567 F.3d 787, 796-97 (6th Cir. 2009) (quoting *Buemi v. Mutual of Omaha Ins. Co.*, 37 Ohio App.3d 113, 116, 524 N.E.2d 183, 186 (Ohio Ct. App. 1987) (quoting *Stipcich*, 277 U.S. at 317)), it remains well-settled Ohio law that an insured's failure to disclose conditions of which he is aware that affect the risk to be assumed, renders a contract voidable at the insurer's option. Moreover, contrary to Ramsey's argument, *Stipcich* was decided *after* Ohio had already enacted former § 3625 of the Revised Statutes, which preceded § 9391 of the General Code, which was the direct predecessor of § 3611.06 of the Revised Code. *John Hancock Mut. Life Ins. Co. v. Luzio*, 123 Ohio St. 616, 626-27, 176 N.E. 446, 450 (1931). Thus, as *Luzio* explicitly noted, this section, or its virtually identical predecessor, was in existence when the Ohio Supreme Court decided *Metropolitan Life Ins. Co. v. Howle*, 62 Ohio St. 204, 56 N.E. 908, in 1900 and stated that the statute does not apply to defenses raised by insurers that are grounded in violations of the policy terms themselves and not on false answers found in the application. *Luzio*, 123 Ohio St. at 627, 176 N.E. at 450. That said, however, despite whatever viability the principles in *Stipcich* may have under Ohio law at the present time, it is not applicable where, as here, the duty imposed on the insurer is a specific matter of a particular representation in the contract, and not a situation where, in the absence of any contractual representation, the proposed insured nevertheless fails to deal in good faith with the insurer by revealing known facts or conditions affecting the risk to be assumed.

[73] In Ohio, "[w]hen the facts presented are undisputed, whether they constitute a performance or a breach of a written contract is a question of law for the court." *Luntz v. Stern*, 135 Ohio St. 225, 20 N.E.2d 241, syllabus ¶ 5 (1939).

*Jackson National Life Insurance Company*[74] provide direction in resolving the present motions.

In *Langley*, the proposed insured signed a life insurance application containing a provision, similar to the one here, that stated that the policy would not take effect unless the "health and habits of the Proposed Insured remain as stated in the application."[75] Again, as here, this representation was incorporated into the insurance contract, and so "must be construed as conditions of the policy."[76]

In that context, the appeals court reviewed the trial court's decision to grant summary judgment to the insurer. The court found that "deposition testimony of the decedent's physicians, as well as his medical records, demonstrated that the decedent's health had changed in the interim between his application for life insurance and the date the insurance was to take effect."[77]

In particular, the appeals court found that Langley signed an application on February 27, 1998, but then on April 21, 1998, saw a physician for an "on and off" cough of two months' duration, which visit was then followed by visits on April 25, May 11, and May 15, all of which showed a worsening progression in diagnosis from gastritis, to

---

[74] *Abella v. Jackson Nat'l Life Ins. Co.*, No. 97-3498, 1998 WL 708706, 165 F.3d 26 (table decision) (6th Cir. Oct. 1, 1998).

[75] *Langley*, 2001 WL 1143019, at *3.

[76] *Id.*

[77] *Id.*

-16-

"concern" that Langley might have a malignancy, to performing a diagnostic bronchoscopy to investigate.[78] Three days after the bronchoscopy, but four days before the bronchoscopy results revealed probable lung cancer, Langley received the insurance policies and paid the premium.[79] As the appeals court stated, "[n]o evidence in the record indicates that Langley informed Federal Kemper of the medical treatment and procedures that he underwent subsequent to his insurance application of February 27, 1998."[80]

Based on the condition in Langley's policy that his health remain as it was stated in the application, the court found that because Langley's health had changed in the manner indicated above, the insurer could refuse payment since Langley had not complied with the policy's terms.[81]

Similarly, in *Abella* the Sixth Circuit dealt with a policy that contained a clause "specifying that the insurance would not take effect if the applicant's health changed prior to the delivery of the policy."[82] And again similar to *Langley*, the Sixth Circuit in *Abella*

---

[78] *Id.*, at *1.

[79] *Id.*

[80] *Id.*

[81] *Id.*, at *4. The court also upheld the decision of the trial court that Ohio Rev. Code § 3911.06 was "inapplicable" to the case.

[82] *Abella*, 1998 WL 708706, at *4.

-17-

noted that the district court had applied Ohio contract law, not Ohio Revised Code § 3911.06.[83]

The proposed insured, Degracias Abella, M.D., had transmitted his revised application for life insurance to the company on June 3, 1993, disclosing that the only diagnostic test he had undergone in the past five years was an electrocardiogram and blood and urine tests in 1992 in connection with an insurance physical.[84] While that application was pending, and before delivery of the policy, which was no earlier than June 16,[85] Abella experienced chest pains while golfing, consulted a cardiologist and received a chest x-ray.[86] Abella did not disclose his chest pain, or the visit to the cardiologist, nor the x-ray to the insurance company, but he did make the initial premium payment on the same day the x-ray was taken, as required by the contract.[87]

As the Sixth Circuit noted, Abella in the application had told the company he had not consulted a physician or had any medical test since 1992, except for an insurance physical.[88] "None of these statements were true as of June 16, 1993 [the date of delivery of the

---

[83] *Id.*

[84] *Id.*, at *2.

[85] There was, apparently, an issue as to precisely when delivery occurred.  The policy was dated June 16, 1993, and *Abella* merely establishes that delivery could not have been prior to  June 16. *See*, *id.*, at *3.

[86] *Id.*, at *3.

[87] *Id*.

[88] *Id*. at *5.

-18-

policy].["89]And "if the insurance company had known that Dr. Abella was having chest pain, that he sought medical advice in this connection, and that he had undergone a 24-hour electrocardiogram and a chest x-ray, the company would have unquestionably made further inquiry before delivering the policy."[90]

As it happens, Abella did not have a cardiac condition. The June 15 x-ray disclosed signs of lung cancer, a condition of which, the court noted, Abella himself was probably unaware at the time.[91] As here, only later tests definitively confirmed the existence of lung cancer – which, again as here, eventually proved fatal.[92] That said, however, the court concluded that if the company had known prior to delivery of the policy of Abella's doctor visits and the x-ray, which showed the possibility of lung cancer, the company "would never have delivered the policy without first assuring itself that Dr. Abella could produce a clean bill of health."[93]

In addition, the Sixth Circuit affirmed the district court's rejection of the argument that the applicant must know the exact nature of a physical ailment from which he suffers or for which he has been treated before he is required to inform the insurer. "That Dr. Abella

---

[89] *Id.*

[90] *Id.*

[91] *Id.* at *3.

[92] *Id.*

[93] *Id.* at *5.

-19-

may have been concerned about a heart ailment and not about lung cancer did not relieve him of his obligation to update the answers given in his application for the policy."[94]

Applying the analysis of *Langley* and *Abella* in the present case, I find that Ramsey has also promised or represented as part of the insurance contract that his health would be the same as he represented it in the application and its amendment as it was at the time the policy was delivered, but that his health was not the same and Ramsey neglected to so inform Penn Mutual, thus permitting Penn Mutual to deny payment of benefits.

The stipulated evidence is that Ramsey, on the original application, stated that he had been treated once for colitis in 1984, but that this treatment had produced a "full recovery" and that he was "last seen" by Dr. Lavery, the specialist treating his colitis, in 2006. In fact, while Ramsey's February 10, 2010, statement that he had last seen Dr. Lavery in 2006 is not contested here, and so is taken to be true at the time it was made, it ceased to be accurate as of April 28, 2010, when Ramsey was seen by Dr. Lavery, and when he again saw Dr. Lavery on May 17, 2010. Plainly, the objective fact of these two visits with Dr. Lavery make inaccurate the February 10, 2010, statement that Ramsey "last saw" Dr. Lavery in 2006.

While Ramsey argues that his condition was a chronic condition, with regularly occurring symptoms, such that the 2010 visits to Dr. Lavery were "nothing new,"[95] the record

---

[94] *Id*.

[95] ECF # 74 at 17.

is clear that Ramsey had represented to Penn Mutual in February 2010 that however frequently his symptoms occurred, or however severe those symptoms were, the symptoms had not been severe enough for him to contact Dr. Lavery for approximately four years. The fact that within the span of less than a month of making that representation Ramsey twice sought treatment from Dr. Lavery for the first time in four years is manifestly something new, and something Ramsey was obligated to report to Penn Mutual.

Just as in *Abella*, where the Sixth Circuit found a contractual duty in the proposed insured to correct or update the statement in the application that he had only undergone routine medical testing years earlier in connection with an insurance application with the factual disclosure that Abella had recently seen a cardiologist, worn a heart monitor, and received a chest x-ray, so too Ramsey was required by the representation in the contract that his health would be the same at delivery of the policy as it was at the time of application, to disclose that unlike the prior four years where his colitis had not required a visit to a physician, Ramsey had recently seen his treating physician twice in the space of a few weeks

for the first time in years because his symptoms had become so severe as to mandate medical intervention.[96]

Further, also as noted in *Abella*, Ramsey cannot escape this duty by claiming that he did not know the ultimate findings of the tests conducted in 2010 before the policy was delivered. The contractual obligation to update his answer about the last time he needed or sought medical attention for his colitis, or risk rendering his prior statement untrue, was triggered when he visited Dr. Lavery in April and May of 2010, thus clearly changing the nature of his prior statement that Dr. Lavery was last seen in 2006.

Penn Mutual's decision not pay death benefits in February 2012 – or nearly two years after the April and May 2010 visits to Dr. Lavery – while somewhat troubling since it came after John Ramsey's death and so after he might have had some opportunity to craft alternative financial plans for his family had he known these policies were to be rescinded, does not preclude Penn Mutual from exercising its contractual rights. Section 9 of the general

---

[96] The Ohio appeals court in *Satterfield* makes the distinction that the "good health" clause does not so much impose an affirmative duty on the insured to update his answers, but rather imposes a burden on the insurer to prove within the time provided by an incontestability provision, if any, that an answer no longer remained true, thus establishing a reason to deny payment of benefits. *Satterfield*, 194 Ohio App. 3d at 412, 956 N.E.2d at 871. This understanding is critical when the "good health" clause is correctly seen as not a condition precedent, the violation of which would preclude the formation of a contract in the first place. Properly understood as a representation or warranty, it is then the duty of the company to prove a breach of the "good health" representations before it may rescind and deny benefits. *Satterfield*, 194 Ohio App. 3d at 410-11, 956 N.E.2d at 870. Any "duty" to report events subsequent to the date of an application inhering in the insured should then be understood as a statement of what is necessary or required to prevent the breach in the first place and not an affirmative legal duty arising outside of the breach analysis.  Accordingly, to the extent I here employ the terminology of a duty in Ramsey, I do so in this sense.

terms of the term life policy,[97] labeled "Incontestability," states that "[a]ll statements made in the application for this policy are representations and not warranties," and that no policy "will be incontestable after it has been in force during the life of the Insured for two years from the Date of issue."[98] In that regard, the policy itself states that the date from which policy years are determined on the term life policy is March 8, 2010.[99] The date of issue for the whole life policy is April 22, 2010.[100]

Because Ohio law construes Ramsey's death prior to the expiration of the two-year incontestability period as tolling that period,[101] it is plain that Penn Mutual exercised its right to deny benefits due to Ramsey's failure to comply with the "good health" clause within two

---

[97] ECF # 1, Ex. 2.

[98] *Id.* at 8. The identical language also appears in Section 15 of the general terms of the whole life policy.  ECF # 1, Ex. 2.

[99] *Id.* at 3, 9; *see also*, ECF # 94 (stipulations) at ¶ 35.

[100] ECF # 94 at ¶ 35.

[101] Ramsey died on September 20, 2011, or just over a year after both policies went into effect. ECF # 94 at ¶ 45.

years of each policy taking effect.[102] Thus, Penn Mutual had a contractual right to act as it did and when it did to rescind the policies, return the premiums, and deny payment of death benefits.[103]

Barbara Ramsey, understandably, seeks to avoid the serious consequences of losing all of John Ramsey's insurance benefits by application of the "good health" clause in this policy by contending that John Ramsey did not believe his chronic condition had changed at all during the application process.[104] Moreover, without citing to or construing the cases discussed above, she makes essentially an emotional argument that it would be a "terribly self-serving reading" of the "good health" clause of the contract to deny Ramsey's widow and children the death benefits they "desperately need" due to John Ramsey's failure to report his "check-ups with Dr. Lavery in April and May of 2010."[105]

---

[102] There does not appear to be any question in Ohio as to the enforceability of the incontestability provision here. First, Ohio statutory law itself mandates that all insurance policies sold and delivered in Ohio contain the clause at issue here. Ohio Rev. Code § 3915.05. Finally, as the Ohio appeals court noted in the analogous case of *Ginley v. John Hancock Mut. Life Ins. Co.*, 34 Ohio App. 2d 163, 167, 296 N.E.2d 839, 842 (Ohio Ct. App. 1973), where the incontestability clause, as here, requires that a policy shall have been in force for a two years "during the lifetime of the insured" in order to be incontestable, the death of the insured prior to expiration of the designated time tolls the running the contestability period and permits the insurance company to assert any available defense to an action to recover benefits.

[103] ECF # 94, Ex. R (Penn Mutual letter of February 27, 2012).

[104] ECF # 70 at 18.

[105] ECF # 74 at 16-17.

While anyone should be sympathetic to the distress facing Barbara Ramsey and her children, I am bound to apply the law to the contract John Ramsey signed. And, as Judge Nelson put it in *Abella*, "just as courts should not read into the language of the policy a 'good health' clause not found in the policy as written, courts should not read out of the policy any condition precedent which *is* set forth in the policy language."[106] That language, as detailed above, imposed an obligation on John Ramsey, under his contractual duty, to "stand behind his answers in the insurance application, informing the company of any changes, up to the date of delivery of the policy,"[107] to keep his answer in the application truthful that, despite his known, chronic disease, he had not seen Dr. Lavery in four years, with the information that he had seen Dr. Lavery twice within a few weeks in April and May of 2010, had a proctoscopy,[108] and received new medications for his symptoms.

---

[106] *Abella*, 1998 WL 708706, at *5 (emphasis original). I note that although *Abella* characterized this language as a condition precedent, Judge Helmick, as discussed above in *Ufer Trust*, properly labeled the clause as a representation. That clarification, of course, does not affect the analysis here.

[107] *Id.*

[108] Penn Mutual argues that a proctoscopy is "the same type of procedure as a colonoscopy," ECF # 68 at 16 n.5, thus, arguably, calling into question Ramsey's duty to update his answer in the original application that he had not had a colonoscopy since 2004. However, since Penn Mutual does not contend that a proctoscopy is precisely the same thing as a colonoscopy, and under the reasoning stated above, since this issue need not be addressed, I make no findings.

Having concluded as a matter of law that Penn Mutual properly denied coverage for death benefits under the policies, I also conclude as a matter of law that Penn Mutual did not act in bad faith by doing so.[109]

## Conclusion

Accordingly, for the reasons stated above, Penn Mutual's motion for summary judgment is granted and that of Barbara Ramsey is denied.

IT IS SO ORDERED.

Dated:  August 7, 2014                    s/ William H. Baughman, Jr.
                                          United States Magistrate Judge

---

[109] *Penton Media, Inc. v. Affiliated FM Ins. Co.*, 245 F. App'x 495, 502, 2007 WL 2332323 (6th Cir. 2007); *Assurance Co. of America v. Waldman*, No. 1:13 CV 179, 2013 WL 6669249, *5 (S.D. Ohio Dec. 18, 2013); *Cleveland Freightliner, Inc. v. Federated Serv. Ins. Co.*, 1:09 CV 1108, 2010 WL 395626, at *13 (N.D. Ohio Jan. 26, 2010); *Warren v. Federal Ins. Co.*, No. 1:07 CV 3695, 2008 WL 9434347, at *7 (N.D. Ohio Aug. 21, 2008).